# GREENWOOD *v.* DOVER.

PATENTS; INTERFERENCE; APPEAL AND ERROR; EXHIBITS, PRESERVATION OF.

1. This court would no more consider an assignment of error in an interference case based upon the overruling by the Commissioner of a motion for a rehearing upon the ground that an exhibit had been changed by frequent handling in the Patent Office, than it would an error assigned in a case at law or in equity upon an order overruling a motion for a new trial or for a rehearing; nor will this court consider affidavits filed herein or in the Patent Office relating to changes that may have occurred in the drawings, models, experimental machines, and like exhibits, as such matters must be wholly settled in the Patent Office. (Following *Blackford* v. *Wilder*, 21 App. D. C. 1.)

2. If a party to an interference desires to have the details and exact condition of an exhibit offered in evidence by him, ascertained and established at the time of its presentation, so as to guard against accidents that may hereafter result from frequent handling, it would be prudent to have it particularly described in respect to appearance, construction, and operation at the time he offers it in evidence.

3. The testimony of a witness to whom one of the parties to an interference claimed to have explained the invention of the issue with the aid of his drawing and with a view to having the firm for which the witness was a traveling salesman manufacture the device, and who was familiar with the art, interested in the improvements therein, and who therefore gave particular attention to the disclosure, is entitled to much greater weight than that of one not engaged in the business to whom a drawing is casually shown.

4. Where the senior party to an interference received a disclosure of the junior party's conception in the course of an interview looking to arrangements for its manufacture for commercial purposes, that fact renders it necessary for the senior party to prove, with reasonable certainty, that he had a prior conception of the same invention. (Following *Gallagher* v. *Hastings*, 21 App. D. C. 88.)

5. Where neither party to an interference proves actual reduction of the invention to practice, but the junior party was the first to conceive and made disclosure of it to the senior before the latter's application was filed, it was *held*, reversing the Commissioner of Patents, that the junior party was entitled to an award of priority of invention.

No. 242. Patent Appeals. Submitted November 19, 1903. Decided March 1, 1904.

HEARING on an appeal from a decision of the Commissioner of Patents in an interference case.                    *Reversed.*

The facts are sufficiently stated in the opinion.

*Mr. Wilmarth H. Thurston* and *Mr. William S. Hodges* for the appellant.

*Mr. Horatio E. Bellows* for the appellee.

Mr. Justice SHEPARD delivered the opinion of the Court:

This is an interference proceeding involving priority of invention of the improved pin-tongue and joint for brooches and like ornaments, described in the following issue:

"In a device of the character described, the combination of a pin having a hook-shaped portion at one end and inclosing a substantially cylindrical bore; a pivot secured at its middle part in said bore of the pin by pressure; a plate, and a cup mounted on the plate and arranged to loosely engage the ends of the pivot."

On account of joints long in use by manufacturers of jewelry, as well as several kinds of pins, patented and unpatented, the margin of invention was a narrow one, as is shown by the proceedings in the Patent Office upon the applications of the respective parties before allowance and declaration of interference.

Dover, the senior party, filed his application September 11, 1901, and in his preliminary statement alleges conception on or about July 1, 1900; first drawings about June 9, 1901; disclosure to others about July 1, 1901; model made about August 15, 1901; and actual reduction to practice about August 25, 1901.

Greenwood filed application February 1, 1902, and in his statement alleges conception on or about July 4, 1899; completed drawings in July, 1899; disclosure to others about middle of July, 1899; and reduction to practice by the construction of a full-sized model or sample between July 4, 1899, and August 1, 1899.

This model or sample was exhibited in evidence, and the examiner of interferences considered it a successful reduction to practice, saying:

"It is crude, it is true, but nothing essential to a complete and operative device is omitted, and the examiner is unable to perceive any valid reason for refusing to recognize it as a reduction to practice of the invention."

Finding that this had been made not later than January 1, 1901, he awarded priority to Greenwood, because Dover's date of disclosure was alleged to be July 1, 1901, and he could not find sufficient evidence of his conception before that date.

On appeal to the examiners-in-chief this decision was reversed and priority awarded to Dover.

They were of the opinion that the Greenwood exhibit was not a reduction to practice. It is thus described by them:

"This exhibit consists of a one-piece back and a pin-tongue which by means of a long pin acting as a pintle is pivoted to ears rigidly connected with the back. This long pin has a series of spiral ribs near its blunt end which form a shoulder or abutment that is larger than either of the holes in the ears. That portion of the pin which lies between this shoulder or abutment and the point is smaller than either of the aforesaid holes, or the hole through the pivot end of the pin-tongue and hence may turn loosely in all three of the holes through which it extends when in place."

The invention which required a tight grip of the pin-tongue upon the pintle or pivot so that the latter would turn at ease in the ears of the cup-joint, and retain its place therein without being headed over at the outer ends, was not conformed to by the operation of the exhibit as above described. In other words, if the bore of the pin-tongue was larger than the pivot, it could not be said that the latter was secured in said bore by pressure.

Looking into the evidence, then, relating to conception and disclosure, they made this statement:

"The interferants and their attorneys appear to have disregarded this limitation of the issue since none of the witnesses in the case were called upon to testify and did not testify concern-

ing any disclosure to them by either interferant of a pin device having as an essential feature thereof a pin-tongue, rigidly secured by pressure to its pivot."

Upon this, the conclusion followed that each party was remitted to the date of his application for even a conception of the invention.

On further appeal to the Commissioner, this decision was affirmed.

Greenwood moved for a rehearing before the examiners-in-chief and filed a number of affidavits to show that when his exhibit model was introduced in evidence, the pivot was securely held in the bore of the pin-tongue by pressure, and that the same had been made loose and the grip of the pin-spring released by frequent and careless handling in removing the long pivot. The record shows no action taken upon the motion, and it was unnoticed in the Commissioner's decision.

Had this motion been formally overruled by the Commissioner and appealed from as a part of his final decision, we would not entertain a reason of appeal founded thereon any more than we would an error assigned in a case at law or in equity upon an order overruling a motion for new trial or for rehearing. For a stronger reason we will not consider affidavits filed either in this court or the Patent Office, relating to changes that may have occurred in drawings, models, experimental machines, and like exhibits. These matters must be wholly settled in the Patent Office. *Blackford* v. *Wilder,* 21 App. D. C. 1, 13.

If a party desires to have the details and exact condition of his exhibit ascertained and established at the time of its presentation, so as to guard against accidents that may thereafter result from frequent handling, it would be prudent to have it particularly described in respect of appearance, construction, and operation at the time that he offers it in evidence.

It may be possible that the difference of opinion, heretofore noted, respecting the effect that should be given the Greenwood exhibit is to some extent due to material changes in its appearance and operation between the respective dates of its considera-

tion. However this may be, we cannot accept this exhibit, in its present condition, as an actual reduction to practice of the invention of the issue.

Under all the facts and circumstances established by the evidence, the most that can be safely affirmed is that at the time of the construction of the exhibit, Greenwood had a conception of that invention. And this notwithstanding it may be conceded to be true, as claimed, that the evidence of neither party goes sufficiently into details to show the specific disclosure of a complete conception of the particular combination that constitutes the invention of the issue as framed in the Patent Office during the consideration of the rival applications.

The testimony, throughout, lays stress upon the new pin-tongue as the thing invented. Evidently it was that which each party thought he had invented. But it must be remembered therewith that the novel pin-tongue of the issue, with its hook-shaped portion at one end inclosing and firmly gripping with its spring-pressure the cylindrical pivot so that the latter can only turn with the movement of the pin, is the central, essential feature of the invention. The arrangement of the familiar cup attachment to the plate, and the loose engagement of the ends of the pivot therein, are necessary and obvious incidents of the construction and operation of the new pin.

Greenwood claims to have conceived the idea of this new pin, and to have made his rude exhibit in 1899, when he was engaged as a mechanic by a firm of manufacturing jewelers. In April, 1901, he opened a small shop in partnership with Howard P. Chase. Chase was not a mechanic but had been a jewelry salesman for many years.

Without undertaking to determine the precise date upon which conception of the invention should be awarded to Greenwood, it is made reasonably clear by the testimony of a competent and apparently disinterested witness that ne had it between June 20 and July 1, 1901. This witness was Daniel H. Child, a traveling salesman for a manufacturer, who called upon the new firm in the course of his business. Greenwood desired the witness to manufacture his pin, and fully explained it to him with the aid

of a drawing. The testimony of this witness is entitled to much greater weight than that of one not engaged in the business to whom a drawing is casually shown. He was familiar with the art, interested in improvements therein, and therefore gave particular attention to the disclosure. It was moreover fresh in his mind when he saw the Dover pin a few months later, and which he said was substantially the same as that which had been described to him.

In 1901 Dover was engaged in the manufacture of jewelry findings. In his preliminary statement he claims conception July 1, 1900; first drawing June 9, 1901; disclosure to others about July 1, 1901; construction and test of the new device on August 25, 1901. The evidence shows that he put the new product upon the market in October of the same year. It was admitted by Dover that he visited the shop of Greenwood and Chase about the last of August, 1901, to talk about some settings that were mounted by them. He said that he told them of his new pin and drew it on a paper produced by Greenwood for the purpose; and that Greenwood remarked he had one in mind also, which he then drew on the same pad. This drawing, he said, was a fac-simile of the drawing of Tilford's patented pin, and he so informed the parties. He further said that Greenwood acknowledged the superiority of his (Dover's) device and asked him to send samples when manufactured. He also said that he took the drawings with him, and did not know what had become of them.

Greenwood's statement of this visit is substantially this: Date between 18th and 25th of August, 1901. Dover came in with Chase and was introduced by the latter. Witness said he wanted his pin-tongue made, and made a drawing of it which he explained in the presence of Chase. Dover said: "That is a grand, good idea—boys; and it is a new idea too. I will make it for you, and anything else you want." That they walked into the workshop and there again discussed the pin-tongue, and witness drew it again on a wooden work-bench. The pin-tongue described and drawn by Dover was entirely different—"instead of the joint straddling the pin-tongue, the pin-tongue straddled

the joint. [It had] a double lug to it, similar to B. A. Ballou's."

At the time of leaving, Dover picked up the paper with the drawings on it and said, "Do you want this?" Witness or Chase said, "No, go ahead and take it." Dover, "pushed it in his pocket and walked off."

Howard P. Chase testified substantially to the same effect. Mrs. Greenwood testified that she had to pass the parties on the way to the telephone and heard Dover say "I think it is a very good thing, boys." She had previously testified to her knowledge of her husband's invention and of his model exhibit. Joseph Gallupo, a mechanic in the employ of Greenwood and Chase, saw Dover in the shop conversing with Greenwood and Chase for fifteen or twenty minutes. He did not hear the conversation, but saw the drawing on the bench. This drawing represented the pin-tongue which Dover subsequently manufactured. While the parties were at the bench he heard Greenwood say: "Look, that is what you ought to make." As they left the bench Greenwood said, "Get that out now."

Aside from the opposing evidence above recited, Dover's description of the device shown in Greenwood's drawing is in conflict with an inference reasonably deducible from other facts. There is other evidence showing beyond a reasonable doubt that Greenwood and Chase, before the interview with Dover, were familiar with the Tilford pin-tongues which were then upon the market. They had bought and used them in their manufacture of jewelry. Bills were produced showing their purchase on April 13, May 11, May 20, and June 3, 1901.

Under such conditions it is most unreasonable to believe that Greenwood undertook to impose upon Dover a drawing of the patented Tilford pin-tongue as his own invention, and to induce him to make the necessary tools for its manufacture. No possible motive can be assigned for such conduct. There was some other evidence offered by Greenwood, in rebuttal, tending to show the finding, under the oil-cloth covering of the work-bench, the drawing claimed to have been made during the interview

with Dover; but in view of what has been said time will not be consumed with a consideration of its credibility or weight.

The fact that Dover received a disclosure of Greenwood's conception in the course of an interview looking to arrangements for its manufacture for commercial purposes renders it necessary for him to prove with reasonable certainty that he had a prior conception of the same invention. *Gallagher* v. *Hastings,* 21 App. D. C. 88, 99.

Moreover, as Greenwood has been found to have had his conception at least as early as June 20, 1901, the burden is thrown upon Dover to prove a conception prior to that date. This, we are of the opinion, he has failed to do.

Of seven witnesses introduced to prove disclosure, three—Stone, King, and Lawson—give dates ranging from June 29 to the early part of July, 1901; their testimony need not, therefore, be further discussed. Another, Morehouse, testified to making the tools for the manufacture of the device about the middle of August. One witness, Possner, said that Dover had often talked with him about pins and pin-tongues, and in the spring of 1901 had shown him an "offhand sketch" of one which was like the picture of Dover's new pin-tongue which he has since seen in street-car advertisements. He fixed the date as of the spring because he was sure that this occurred at a meeting of the whist party to which both belonged, and the party, or association suspended in May. Testimony undertaking to identify an invention of this character through the recollection of a rough sketch casually shown at a card party long before is inherently weak. Moreover, the date given shows that it must have been a different invention, because Dover himself says that his earliest date of drawing was June 9 and of disclosure was July 1, 1901.

Charles I. Brown testified that a drawing of the pin was shown him by Dover. In his direct examination, he said:

"I think it was in the early summer. To the best of my judgment it was in the early summer."

On cross-examination, it was made to appear that the time might have been as late as August, and on redirect examination he declined to swear that he saw the drawings in June.

The last witness was George H. Tilford, the inventor of the Tilford pin-tongue. He testified that Dover came into the office of the Wolstenholme Company, in whose shop he was employed, in March, 1901, and showed him a drawing of a pin-tongue similar to that in the invention of the issue. He was positive as to the date on both direct and cross examination.

It is a circumstance of some significance also that no one of the drawings made for exhibition to these witnesses severally has been produced. Like those made in Greenwood's shop in August, they have disappeared.

Dover was careful not to leave his drawings in the possession of others, but carelessly omitted to preserve them for subsequent use.

In this he fell short of the care which he subsequently exercised in attempting to protect his right to the invention after he began to prepare for its manufacture and introduction to the trade.

For the reasons given, we must reverse the decision appealed from and award priority to Greenwood.

It is so ordered, and, further, that this decision be certified to the Commissioner of Patents as the law directs.     *Reversed.*